Okay, the next case is number 14, 3163, Kevin Lacey against the Department of Veterans Affairs. Mr. Gagliardo. Good morning, Your Honor. Thank you. May it please the Court. Mr. Lacey has challenged not the finding of the arbitrator, which was that he was denied an opportunity to respond to material used against him. Mr. Lacey says that having found that to be a fact, the arbitrator should have, as this Court instructed in Young, ordered a new constitutionally correct procedure. Could I ask a point of clarification? Yes, sir. I was curious. I know that your colleague who, Mr. Pelowitz is no longer. He's got to try this case. That's correct, Your Honor. In the record, we have a document which was the Douglas Factor Analysis. Yes, sir. Which is at page A45, I believe, in the record. I believe that's correct. A45. And we also have, at A49 in the record, the communication to your client about the charges, correct? Correct. And on page A49 in that, paragraph 5, it says, the evidence on which this notice of proposed action is based is located at so-and-so, and if you want to come look at it, it's available. Was the Douglas Factor Analysis included in that evidence? The government says it was. Precisely the question, Your Honor. The question is yes or no answer. I think the answer is no, and I'll tell you why, and I was going to address this. The evidence that the department submits in its brief is the testimony of the proposing official when she's asked the question whether she performed the Douglas Factor Analysis before or after she decided to impose a suspension. She said, I did it before, so I could, she says, there's some ambiguity in her testimony. Well, she said it before. She mumbles mm-hmm, which could be mm or mm-hmm affirmative. No, she said it before. She says before, but what's not in the record, and I think this is why there's substantial evidence to support the arbitrator's finding, which cannot be challenged here, there's no cross-appeal, but I think there's substantial evidence to support the arbitrator's finding that Mr. Lacey was deprived of the opportunity to review and respond to that because the only evidence in the file is the document that you refer to, which does not bear a date except when the deciding official signs off on it, and that date is August the 11th. The time for Mr. Lacey to respond expired on the 10th. There's no evidence that that document, and I think your question is precisely the question in this case, there's no evidence that that document was put into the file at any particular time, and there's every reason to believe it wasn't put into the file until the deciding official signed off on it. In any event, the arbitrator made a factual finding, and that factual finding was that Mr. Lacey was deprived of notice and opportunity to respond to precisely that. They made three findings, made a finding that wasn't disclosed, made a finding that wasn't shared with, meaning actually given to, and then made the finding that it wasn't appropriately presented to. What does that mean? Well, I think those are more subtle questions, and I really don't know that this court… I'm sure I'm getting at it. I mean, there's some confusion here. Well, I think what the arbitrator is saying, and I don't know if the court has to get to this issue, is that it's not sufficient to simply say in a proposal, if you want to know more, go get it, that it's not sufficient if all that… We have a case that says it is. Well, I'm saying I don't think we have to… it wasn't part of my argument here. Wouldn't you agree that if indeed Mr. Lacey, that the statement that was challenged, which is in the… Proposal. In the proposal, in the Douglas-Fackler analysis, if that was made available, then there wouldn't be a problem under an ex parte communication. Well, if they had said to him, yes, here it is, then… No, if they say, here is the evidence… Oh, go get it. We've got a previous case that says making that available undermines the claim to an ex parte… I now understand what you're asking. If in fact the evidence was that it was in the file, and that he was given the opportunity to review the file… Well, he was given the opportunity. He was given the opportunity, but there's no evidence, and the arbitrator apparently found that it was not in the file, because he concluded Mr. Lacey did not have the opportunity to see it and to respond to it. We didn't exactly say that. The arbitrator didn't use those words. He didn't use those words. We might be very careful what we're saying here. Sure, but the implication can't be otherwise. See, the absence of evidence tells you as much about what really happened as the presence of evidence. I think that's axiomatic. I think when you look at the government or the department's primary argument that the proposing… Everything that goes into the charges, including the Douglas factor now. Except that we have contrary evidence in this case. We have an undated document. We have evidence that doesn't establish. There's no effort by the department to say that it was there. That's clearly the challenge. They don't refute it, and then in their brief they cite a piece of testimony that certainly does not compel the conclusion. It doesn't even create the inference that the document was put in the file. It's a totally separate matter. When did you consider it? I considered it before I made the decision to suspend at all. Can I ask another question just about process here? If you prevail here, your client was given a suspension of a reduced period from 30 days to 2021, something like that. Right, and there's some ambiguity which way it was 2021. Has the client already served that suspension? Yes, indeed he has. So that suspension is served. So if it goes back, the agency is free to start this case over again. They would be free to start it over again if they chose to do so. As a deciding official said on the record, in the deciding official's opinion, your client was given some leniency. Removal could have been charged here. That's what the record shows. Well, I suppose it could have been charged. I mean, it would face the same. That's exactly the word. So on remand, your client is exposed. He said they could have gone for removal. That's what the deciding official said. So your client can be exposed to a removal procedure. You mean they could up the ante if he gets a new trial? That's correct. If you go de novo, you risk the whole thing? I'm not— I mean, we're sending it back because of a due process violation, and the cure for that is a new proceeding. To me, the agency could say, well, we're going to cancel that proceeding. We're going to review the evidence, and we're going to give you access to everything, including that one sentence in the Douglas-Becker report that you're complaining about, and we're going to remove you. Well, I suppose that's a risk that Mr. Lacey has to decide if he wants to take and impress him as a appeal. He's taken that risk. But I'd make two quick comments, and I don't know that they're this positive on the legal issues. Number one, I know of a case where a very dramatic case that went to this court was settled, actually, and the agency could have certainly re-noticed and given the employee a new procedure. They did not. They did not. So that's a choice of the agency as well as—that they have to make as well as the choice that the employee has to make. But the other thing is this. I think the agency would be hard-pressed— if they're going to have an agent fee, they're going to lose one, right? I'm sorry. I mean, isn't recovering your fee a slam dunk? If we get the back pay— I think so. If Mr. Lacey is entitled to back pay, we're entitled to fees under the Back Pay Act if we meet the other criteria, which I think we do. But the other comment I want to make is this. I've lost my point now. I'm sorry, Your Honor. Well, I've lost my point. It would seem to me that if indeed there's an ex parte communication problem here, the chips fall in your favor as we just described. That's the way I saw the case. But so the question that I had hinged on right away was who's going to resolve this disagreement as to whether or not Mr. Lacey had access to the forbidden document? I think in the first instance it's the arbitrator's already decided that and there's substantial evidence to support his conclusion. As I mentioned, an undated document then dated after the time has expired, an absence of evidence that it was ever in the file, and then a response— So it was dated after? Yes, Your Honor. How do we know when it was dated? If you look, the document itself says on the bottom—let me just get it for you. Thank you. It's in the appellant's brief. When your client declined the Douglas Factor analysis, 8-17-2011 was the date. Yeah, I read it twice. By the way, it's 8-45 and 8-46. On 8-46— Where do you see a date? I see a date on the—it says Sherry L. Early, who's the proposing official, her typewritten document is undated. That's the argument I was making. And then it's signed off by Dennis Smith, who's the CEO of the health system. I read that first as 8-17, but I think it's 8-11. I think that's the only fair reading. In any event, it's after August the 10th, which is— He's the deciding official. Correct. Well, it has to have been—he has to have dated it after it was prepared. Yes, it was prepared. The question is this. As you asked before, as you mentioned before, A, was it in the file? The evidence—the fair implication is that it was—the fair inference is that it was not in the file. There's no evidence of that, and the arbitrators made a finding. The second question is, you know, when was it even prepared? When was it created? It could have been created at any time in the process up to and including— All before the 11th. Correct. And that is not answered definitively. We don't have record evidence that said it was created on an X, Y, or Z date. But we do—but the more important point is there's no evidence that it was ever in the file to which Mr. Lacey was told he could go and view it. That's the grommetment of the case. As to its prejudicial effect, let me just make two quick comments. Well, there's evidence that he was allowed to go look at the file. That's in page A14. Yeah, I'm not disputing it. Not disputing it. It does say—it's clear in the proposal. It says if you want to go look, here's where it is. You can have time off to go look for it. That's not contested. The question is what was in that file. But here's the other important thing about what was in the file. That is A45 and A46, which we say was not in the file. It's a very general and vague statement of misconduct that was, if you will, ignored. In other words, what the proposing official is suggesting to the deciding official is, look, we've given this guy a free ride for a long time. Now's the time to crack down on him. What could be more prejudicial? Right. But the problem is that the way that the arbitrator dealt with this statement—you know, we've often got complaints that he has a problem with not carrying his weight. That's what it's all about. It looked to me like what the arbitrator was saying is, well, that's sort of hearsay, and I don't think I'm going to allow that statement to carry any weight for the size of a penalty, so I'm dialing the penalty back. The arbitrator didn't say, oh, this is an ex parte communication, and I therefore now have to decide whether it was new and material. Actually, in the petitioner's brief A-1, it begins the opinion and award of the arbitrator. And what he in fact says is, in considering the Douglas factors, the grievance supervisor made certain claims that were considered by the disciplining official but not disclosed to the grievant, nor was any evidence demonstrated to support those claims in the arbitration hearing. So I think it gives it weight. This is where I wanted to go at the very beginning. Your whole argument seems to be amiss. You're arguing that this is ex parte communications, but isn't your argument that he was penalized based on uncharged conduct? Yes. Really, that's a different analysis. That doesn't have to do with ex parte communications. That has to do with the fact that it's got to be within the four corners of the chart. I always disavow scholarship when I make these arguments, and I guess I have to do it again. The significance of the difference is escaping me, because yes, it's uncharged. It's uncharged, meaning he didn't have notice of it. He certainly knew that he had a disciplinary record. He did have a disciplinary record. He personally knew that he had a disciplinary record and had actually received progressive discipline in the past. He had a reprimand and a ten-day suspension, I believe. If I recall correctly, the reprimand is unrelated. The ten-day is not. Right, so those things he certainly knew about. So if we're talking about what he knew about, then that puts you in a more difficult position. The question is whether or not, under the Douglas factors, he can be repunished for that conduct without a charge that incorporates that. Right, plainly he can't. I mean, that's the most essential principle, that you've got to tell somebody what they're charged with. But didn't the arbitrator, gracefully or not, essentially fix that problem by cutting it back from 30 days to 20 days? He fixed it to some degree, but he disregarded what Young said is the proper remedy. Young clearly says the proper remedy is a new constitutionally correct procedure. So you go back to a new procedure and you could end up at 30 days, you could end up at 50 days. Well, that's the thought that I had lost when Judge Clevenger asked me the question. I think the agency would be hard-pressed, to say the least, to establish that it's reasonable to impose a greater penalty after going through everything that's since been gone through. But they certainly could easily go back to 30 days. I would take my chances. They could go back to, excuse me, yes, they could go back to 30 days, yes. Okay, let's hear from the other side. We'll save you some rebuttal time. Thank you, Your Honor, I appreciate that. These are a few. Thank you, Your Honor. May it please the Court. I've heard, I think, at least three new arguments, so I'm going to jump into those and then I'll go back to the main arguments I've made if I have time remaining. The elephant in the room is whether or not the Douglas Factor memo was in the evidence pile. And so you've heard the arguments that have been made by the appellant as to why it was not. Why do you think it was? I do think it was. I'd like to note that I do think that's a new argument, so I think, first of all, I would say they've waived that argument.  I'm replying to your argument in your red brief, which was to say, well, this is not an expertly statement because you had access to it. They come back and say, no, there was a factual finding by the arbitrator that that's not so. So where's the waiver? Okay, well, if there's not a waiver, there's not a waiver. I'm just sort of admonishing the government from claiming something that's frivolous. I mean, there's no waiver. I'm sorry, Your Honor. I'll move on. I think the record certainly supports that that document was in the file. Where? What supports that the document was? We see the word the evidence on page 49, and the question is whether or not the document, which is at A45, was in the evidence, yes or no. I understand that. Well, I think, first of all, the document that you're referring to, the proposal that was given to Mr. Lacey that invites him to go look at all the information, it says the information upon which this is based is in this file for your review. And I think, as the Court mentioned, the government's entitled to a presumption of regularity. It's saying we're giving you the information to look at. How do we know? Just back up. The presumption of regularity was the point I raised. It's not in your brief. How do we know what is regular here? You haven't put it in your brief. You've made no argument in your brief whatsoever to support a presumption of regularity argument. Right? That's true, Your Honor. That's true. We did make an argument in our brief that the testimony, first of all, the document says the information is being made available. You see the person who created the document. The testimony of the person. The person who created the document says I did it before we made the charge. Yes. Correct. And putting the notice that says all the information is available to you in the Human Resources Office that we relied on, and the fact that that was part of the information that was relied on, I think putting those two things together, it's pretty clear that that analysis was in the Human Resources Office. What did you make of Helen's argument that the fact that the Douglas Factor memo isn't dated, but we know it was created on or before 8-11-2001? Well, I think we know that it was created. What's the magic of 8-11-2001? If you're talking, the date that was, when it was dated by the deciding official, that indicates that he's reviewed it in the scope of his review of materials that were presented to him, and then he does his own sort of Douglas Factor checklist that's also in the record where he initials each Douglas Factor. I would also certainly suggest that he was aware of it. We know he was aware of it because he relied on it in his decision. Correct? Yes, Your Honor. So I think that the only question is if, and the reason I'm pushing on this is that I think in a very candid and helpful way, the appellant has said that if the Douglas Factor document was in the evidence that was, he agrees it was made available, then he doesn't have a case. The whole ex parte case falls. Yes. So it becomes quite important for us to know whether or not the document 845 is in the record, and there seems to be, doesn't there, an implicit finding by the arbitrator that it was not in the evidence? Well, I think the arbitrator's finding is not a model of clarity. Well, let me back up. Do we presume that the arbitrator knows the law? The arbitrator knows that you can't have an ex parte communication if the so-called communication was made available? I think that's right, Your Honor, and he doesn't state that he's making a finding that there was an improper ex parte communication. He never uses the word ex parte or due process in his decision, even though he uses it earlier on when he's describing the argument that was made to him. So he's cognizant of the argument being made. He chooses not to use those words. He also chooses a remedy which is impermissible if he's following down the ex parte communication theory route. Exactly, Your Honor. It may be that what he's doing is... Frontier justice? Well, it's not entirely clear. It's possible that he, you know, if he is making a due process finding in his analysis, I think what he's doing based on his remedy is agreeing with the government's alternative argument, which is if there was an ex parte communication, it didn't rise to the level of a due process problem, and therefore we don't need a new process. Which is a response to my point to the other side of the end there, which is this whole analysis, this whole ex parte analysis seems to be off base. The real point was did the charge actually say that you're being charged for a pattern of AWOL activity, including those for which you've already been punished, or did the charge only relate to specific incidences of AWOL and specific incidences of insubordination, and therefore was it improper for the Douglas factors to take into consideration prior conduct that had already been addressed by the agency? I don't think there's evidence that he's being charged for something beyond what's in the specific charges. The document that proposes his suspension does state that it will take into account prior discipline. It does give him notice of that, and it mentions the two specific incidents, the reprimand and the earlier suspension, the 10-day suspension. And there's testimony, and I don't think we cited this, but it's in the hearing transcript on page 22, starting at line 17, about how the deciding official used these two prior incidents. And I think his description of how he used them is exactly appropriate. He used them not to make some sort of judgment that because he behaved this way in the past, his behavior this time could be assumed to be equally improper. Instead, he used them to just make sure that progressive discipline was happening as it's supposed to. He's asked, what was the primary reason that you felt the 30-day suspension was appropriate? And he answers, I believe he'd had a 10-day suspension prior to this, so where do you go from that? You need to do progressive discipline. So he needed a suspension that was more than 10 days. And under the circumstances, I felt that a 30-day suspension was appropriate. And so I don't think he's using those earlier incidents as some sort of aggravating factor or using them to address his character in some improper way or make assumptions about what actually happened. He's just using them in the sense of looking at the progression of discipline. So why didn't you object to the arbitrator's decision to arbitrarily cut back the penalty rather than leave it to the agency to make that determination? I think that would have been unusual for such a small change, and the agency didn't express interest in doing that. Now, I'll just turn back to the general arguments that we've made. We don't think that the Department of Veterans Affairs violated Mr. Lacy's Fifth Amendment or ITG process through ex parte communication. Are you making an alternative argument that if indeed we do decide there is an ex parte communication problem here, it's harmless because the information was not new and material? Well, I think we wouldn't use the term harmless because that is... Well, I mean, if it's not new and material and therefore it's not an ex parte communication. We would say it's not new and material and therefore... Are you asking us to make a judgment that it was not new and material? We are asking the court to make a judgment that if there were an ex parte communication, it's not new and material and therefore... How can we do that? I mean, obviously it was material enough to the deciding official to change the penalty, right? He didn't change the penalty. He just decided... He reduced the penalty. Well, yes. I mean, it's the difference between, you know, 20 days in jail and 30 days in jail. So he reduced the penalty. So it had to be material for that purpose. And it was new, at least to Mr. Lacey, because it wasn't disclosed to him. So how can it not be new and material? Well, Your Honor, we don't think it's new and material because... The statement at issue communicates only that Mr. Lacey was a problem and was not carrying his weight. And we think that all of the other documentation that supported this proposal communicated the same issues with Mr. Lacey. From the same audience? Well, even... There's one thing to say if there's one person in the room that thinks that Clevenger doesn't do his job and pull his weight, but it's a different thing if everyone who works at the court feels that. Well, I'm sure there's... I'm sure that's not a problem, Your Honor, but... Don't speak too soon. I think that even if you look at the document, I don't think there's any indication that the fact that the deciding official relies specifically on hearing that same issue from different parties. I don't think there's anything in the record that supports that. But even if you look at, in terms of whether or not Mr. Lacey had this information and whether or not the deciding official would have had this information without that specific statement, everything else that the decision was based on I think communicates the same ideas. The first charge, including the charging document, the proposal itself, the first charge, absent without leave, recounts six incidents where Mr. Lacey was expected to be at work but neither showed up or sought to take leave. The second charge, failure to follow instructions, recounts an occasion where Mr. Lacey refused to update a patient's record as instructed. And the third charge of disrespectful conduct recounts the fact that Mr. Lacey not only failed to do something that his supervisor asked him to do but responded to her in an insulting and disrespectful manner. So all three of these charges describe an employee who's a problem and who's not carrying his weight. If he doesn't show up for work, he's not carrying his weight. Somebody else has to do that. If he's refusing to do the work that his supervisor tells him to do, he's not carrying his weight. Someone else has to do that work. And that's a problem. So I don't think it was new and material for anyone to hear that he was a problem and not carrying his weight. So, therefore, we think it's cumulative. And even if this was an ex parte communication, it didn't rise to the level of a due process violation. Turning to the last argument we made having to do with Mr. Lacey's request for back pay and attorney's fees, we don't think he's entitled to that relief here. First of all, we don't think there's a due process violation. I mean, if there's a due process violation, he wins, right? Well, if there is, we still think he has to meet the standard for the attorney's fees. There's a standard set forth in Allen v. United States Postal Service, a five-prong test that is examined. And we don't think he's made any sufficient showing at this point. Even the criterion under that standard that refers to procedural error requires more than a showing of harmful procedural error. It requires a balancing test between the agency's excuse and the prejudice to the employee. And here the agency pretty clearly tried to make materials available to Mr. Lacey. Pretty clearly, Mr. Lacey was on notice that he was a problem and not carrying his weight, whether or not he saw that statement and that he needed to defend against that. So even assuming that the agency erred, it's not clear that Mr. Lacey can meet that balancing test, and he hasn't offered any argument to that effect. For all of the foregoing reasons and for those set forth in the government's papers, government asks that the court affirm the arbitrator's decision sustaining Mr. Lacey's 20-day suspension. If the court has no further questions, I have nothing further. Thank you, Ms. Urfield. Okay, Mr. Gallardo, you have a few minutes, let's say four minutes. Thank you, Judge Newman. Let me just make a couple of quick points. Talking to the point raised by Judge Clevenger on new material, what's really very new is the second part of the statement, his behavior affects the morale of other employees in the work area. That's not stated in the proposal in any way, explicitly or implicitly. We often get complaints from his coworkers that he has a problem in not carrying his weight. That's, again, not implicitly or explicitly in the proposal. Clearly new, clearly prejudicial. The arbitrator said it was considered by the deciding official. You can find that at page A51. A quick comment on progressive discipline. If you look at the testimony that my Honorable Counsel referred to, the deciding official saying there was a need for progressive discipline. He had already been disciplined for 10 days. Therefore, he needed more than 10 days. That is a complete contradiction of what Douglas says. Douglas says least appropriate to deter future conduct and all the other factors. You may have a lesser offense on the second go than you had on the first go, and according to Douglas, you would have to then impose a lesser, not a greater penalty. The thought, and it's a misconception that I frequently confront with management officials, is if we gave you a year in jail the first time, we've got to give you two years in jail the second time, even though the first offense was armed robbery and the second offense was shoplifting. That's more theoretical as opposed to the specifics of this case. I think we've, in terms of regularity, yes, it's a presumption. It's a rebuttable presumption. I think we rebutted it. I think we discussed that when I made my original presentation, but I'm glad to answer any further questions if that be the case. You don't agree that the government laid down any precedent for a presumption of regularity here, right? They did not. They clearly did not. Well, it only came up out of my mouth. Yes, sir, as did frontier justice. But, yes, there's lots of frontier justice in the world of labor arbitration. Okay, thank you. Thank you, Douglas. Thank you very much.